GEORGE VELARDO,                     )
                                    )
     Plaintiff,                     )
                                    )
     vs.                            )    Civil Action No. 07-1604
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
     Defendant.                     )

## MEMORANDUM OPINION

## I. INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff George Velardo and Defendant Michael J. Astrue, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Defendant's motion is denied, Plaintiff's motion is granted in part, and the case remanded for further consideration.

## II. BACKGROUND

### A. Factual Background

George Michael Velardo was born on September 30, 1976. According to a statement submitted by his mother, Brenda Wilson, Plaintiff's birth was difficult and he was immediately placed on a respirator and heart monitor. (Certified Copy of Transcript of

Proceedings before the Social Security Administration, Docket No. 8, "Tr.," at 159.)   At the age of eight months, after he experienced a high fever, a "brain wave test" revealed that the child was "mentally retarded" and Ms. Wilson was told he would have to be placed in a special education program.   At age two and a half, he was enrolled in a school for exceptional children and at age six, further testing confirmed that he was mentally retarded. (Id.)

In an undated report prepared when Plaintiff was in the fifth grade, his classroom teacher reported he was functioning at a second grade level in reading, spelling, and arithmetic. Although he was pleasant, usually cooperative, and socialized well with his classmates, he had a short attention span, difficulty retaining and following even two- or three-step directions, and was frequently unprepared for school work.   The teacher recommended that he continue in classes designed for students who were considered "educable mentally impaired"[1] ("EMI.")   (Tr. 301.)

In December 1990, at the age of 14, Mr. Velardo underwent intelligence testing (the "WICS-R" or Revised Wechsler Intelligence Scale for Children test) as part of the process to determine his educational plan.   The test revealed a verbal score of 70, a performance score of 71, and an overall score of 69.   (Tr. 298.) It was further noted at the time that he had difficulty with

---

[1]   As indicated below at note 9, "educable" is "roughly equivalent" to mild mental retardation.

written expression, math calculation, and math reasoning. (Id.)
He continued in EMI-level special education classes through at
least May 1991. (Tr. 286.) In May 1992, at the end of ninth
grade, Mr. Velardo dropped out of school. (Tr. 71.)

For the next ten years, Plaintiff worked intermittently at a
variety of jobs - factory maintenance, cleaning boats, delivery
person for a pizza company, driving a truck, painting, plumbing,
working in sales for an appliance company, maintaining inventory
control, and as a supervisor in a bottling company. Ms. Wilson
noted that her son had difficulty holding a job because he had "to
be reminded time and again what his job duties [were.] Bosses not
too agreeable on his problem [sic]." (Tr. 102.) In 1994, while
working as a roofer's assistant, Mr. Velardo fell 39 feet off a
roof and a bundle of shingles he was carrying at the time struck
him on the lower back. He was examined by a medical doctor and, as
he later reported to his treating physician, was told he had a
fracture in his spine; however, no medical records pertaining to
any treatment at that time appear in his file. (Tr. 227.) Despite
chronic pain in his lower back, Mr. Velardo continued to try to
work even after he was diagnosed with degenerative disc disease in
his lower back, knee problems, chronic obstructive pulmonary
disease ("COPD") and asthma. His last employment was changing oil
for Jiffy Lube; he left this job as of August 1, 2003, because he
could "no longer do the work" due to severe pain in his knees and
back. (Tr. 67-68.)

3

## B.    Procedural Background

On September 27, 2004, and October 4, 2004, Mr. Velardo filed applications for supplemental security income and disability insurance benefits, respectively, alleging disability as of August 1, 2003, due to back pain, leg numbness, asthma, fatigue, a learning disability, and knee problems. (Tr. 32.) The Social Security Administration ("SSA") denied Mr. Velardo's applications both initially and upon reconsideration, reasoning that although he could not return to his previous work as a "service attendant,"[2] there were other jobs he could perform despite his mental and physical limitations. (Tr. 32, 35, 44-47.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 26, 2006, before Judge George L. Evans III, in Knoxville, Tennessee. Mr. Velardo, who was represented by counsel, and his mother, Ms. Wilson, testified; apparently, according to the hearing transcript, no vocational expert or medical expert was present at the hearing. (Tr. 370.) Judge Evans issued his decision on January 26, 2007, again denying benefits. (Tr. 12-24.) On September 27, 2007, the Social Security Appeals Council advised Mr. Velardo that it had chosen not to review the ALJ's decision, finding no reason under

---

[2] This appears to be a reference to his job with Jiffy Lube which is categorized elsewhere as a "service station attendant." (Tr. 123.) We note the state agency examiner's opinion that Mr. Velardo could continue to perform this work (Tr. 124) is inconsistent with that of the SSA in denying his applications for benefits.

4

its rules to do so. (Tr. 5-7.) Therefore, the January 26, 2007 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). On November 21, 2007, having moved to Western Pennsylvania in the interim, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind

5

might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **ANALYSIS**

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is

6

unable to pursue substantial gainful employment[3] currently existing in the national economy.[4] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(I); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Velardo satisfied the first two non-medical requirements and the parties do not object to the ALJ's finding that Plaintiff's date last insured was March 31, 2007. (Tr. 17.)

To determine a claimant's rights to either SSI or DIB,[5] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment

---

[3] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[4] A claimant seeking supplemental security income benefits must also show that his income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

[5] The same test is used to determine disability for purposes of receiving either DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

7

or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[6] to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Evans first concluded Mr. Velardo had not engaged in substantial gainful activity since

---

[6] Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[7] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

8

August 1, 2003, his alleged disability onset date when he quit work due to pain in his back and legs. (Tr. 17.) In resolving step two, the ALJ found that as of the date of the hearing, Mr. Velardo suffered from the following severe impairments: "back, bilateral hands, respiratory, left leg numbness, and depression."[8] (Id.) At step three, the ALJ concluded none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any relevant Listing. That is, Plaintiff's mental retardation[9] did not satisfy Listing 12.05C nor did his depression meet the criteria of Listing 12.04, affective disorders. (Tr. 18.) The ALJ did not identify the relevant listings regarding Plaintiff's back, hand, leg or respiratory problems, concluding "the evidence in his medical file does not reflect that any of his impairments are so severe, either singly or in combination, that the claimant would

---

[8] At step two, the ALJ did not make any finding as to the severity of Plaintiff's mental retardation, yet addressed this impairment at step three of his analysis.

[9] "Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of 'educable.' This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate support, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings." Durden v. Astrue, CA No. 07-865, 2008 U.S. Dist. LEXIS 88963, *18 (S.D. Tex. Sept. 8, 2008), *quoting* THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th Ed. Text Revision) ("DSM-IV") at 42-43.

9

not be able to perform substantial gainful activity on a sustained basis." (Tr. 19.)

At step four, the ALJ concluded Plaintiff retained the residual functional capacity to perform simple, unskilled, medium work. (Tr. 19.) Applying the Medical Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, App. 2, the ALJ concluded, based on Plaintiff's age, limited education, work experience, and residual functional capacity, that jobs exist in significant numbers in the national economy which Mr. Velardo could perform despite his limitations. (Tr. 23, *see also* Medical-Vocational Rule 203.25.) Thus, Mr. Velardo had not been under a disability and was not entitled to benefits at any time between August 1, 2003, and the date of the ALJ's decision. (Tr. 23-24.)

## B. Plaintiff's Arguments

Mr. Velardo raises two related arguments in his brief in support of the motion for summary judgment. (Doc. No. 11, "Plf.'s Brief.") First, the ALJ erred in his conclusion that Plaintiff did not satisfy the first criterion of Listing 12.05C, that is, "a valid verbal, performance, or full scale IQ of 60 through 70," supported by evidence showing the impairment existed before age 22. In light of IQ tests administered when Plaintiff was 14 years old, the ALJ erred as a matter of law by finding it was "inconclusive" that Plaintiff met this first criterion. (Plf.'s Brief at 7-13.) Second, the ALJ erred by finding at step two that Plaintiff had several severe impairments - back pain, bilateral hand pain,

10

obstructive respiratory disease, left leg numbness, and depression
- yet concluded he did not satisfy the second criterion of Listing
12.05C, i.e., "a physical or other mental impairment imposing an
additional and significant work-related limitation of function."
(Id. at 14-18.)

C. Analysis

1. *Listing 12.05C*: Listing 12.05 begins with an
introductory paragraph setting forth the diagnostic description for
mental retardation. According to this so-called "capsule
definition," mental retardation refers to "significantly subaverage
general intellectual functioning with deficits in adaptive
functioning initially manifested during the developmental period,
i.e., the evidence demonstrates or supports onset of the impairment
before age 22." 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05. The
Listing also contains four sets of criteria, A through D; if the
claimant's level of mental retardation satisfies any one of those
four sets of criteria, the ALJ should conclude at Step 3 that the
impairment satisfies the Listing. As succinctly stated by the
United States Court of Appeals for the Third Circuit, a claimant
satisfies the three-prong test of Listing 12.05C when he shows he
"i) [has] a valid verbal, performance or full scale IQ of 60
through 70, ii) [has] a physical or other mental impairment
imposing additional and significant work-related limitations of
function, and iii) [can] show the mental retardation was initially
manifested during the developmental period (before age 22)."

Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).

Social Security regulations further provide that when, as in this case, "more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full IQs are provided in the Wechsler series, [the SSA will] use the lowest of these in conjunction with 12.05." Listing 12.00, ¶ D.6.c. Only one score within this range is necessary to satisfy this portion of the test. *See* Burns v. Barnhart, 312 F.3d 113, 125, n.6 (3d Cir. 2002), noting that the claimant receives the "benefit of the doubt" inasmuch as the lowest score on a multi-part IQ test is the score used in the rest of the analysis. This portion of the regulations also states that the IQ assessment should be accompanied by a narrative report which indicates "whether the IQ scores are considered valid and consistent with the [claimant's] developmental history and the degree of functional limitation."

2. *The ALJ's discussion of Listing 12.05C:* Judge Evans discussed the criteria of Listing 12.05C at several points in his decision. He first noted that intelligence tests administered when Plaintiff was in elementary school[10] showed that he had obtained a verbal IQ score of 70, a performance IQ score of 71, and a full scale IQ score of 69. (Tr. 18, *citing* Exhibit 12F, Tr. 284-301.) He further noted that according to his fifth grade teacher,

_____

[10] The IQ tests were actually administered in December 1990 when Plaintiff would have been 14 years old and presumably was in the seventh or eighth grade. (Tr. 298.)

12

Plaintiff was functioning at second-grade level in reading, spelling, and arithmetic at that time and should continue in special education classes for children described as "educable mentally impaired." (Id.)

As part of a consultative psychological evaluation performed on November 24, 2004, Kathryn Smith, Ph.D., administered the third edition of the Wechsler Adult Intelligence Scale test ("WAIS-III"), on which Plaintiff obtained a verbal IQ score of 72, a performance score of 76 and a full scale score of 72. On the Wide Range Achievement Test-III, Mr. Velardo scored at third grade level for reading and at second grade level for arithmetic. Dr. Smith stated Plaintiff's intelligence level could be considered in the borderline intellectual range. (Tr. 18, citing Tr. 175-181.)

At the hearing, Plaintiff's attorney proposed that Mr. Velardo met the criteria for Listing 12.05C. In his decision, the ALJ wrote that he:

acknowledge[d] the assertion of claimant's attorney that the claimant meets 12.05C due to his IQ score of 69 when the claimant was initially tested by the school psychologist in 1990; and the fact that the consultative psychologist Dr. Smith opined that there was a 95 percent probability that the claimant's true full scale IQ score[ ] fell between 68 and 77. . . .The undersigned concludes that it is inconclusive whether the claimant meets the first prong of 12.05C with an IQ score of 69, as he actually obtained IQ scores ranging from 72 to 76 which the psychologist noted were in the borderline range of intellectual functioning rather than mild mental retardation. . . .The undersigned finds that the second prong of 12.05C which requires a physical or other mental impairment imposing an additional and significant work-related limitation of function is definitely not met in

13

that his global assessment of functioning (GAF)[11] is 65, and there is no objective evidence to substantiate his allegations of physical disability due to problems with his back, hands, left leg, and respiratory problems as the evidence in his medical file does not reflect that any of his impairments are so severe, either singly or in combination, that the claimant would not be able to perform substantial gainful activity on a sustained basis.

(Tr. 18-19.)

At step four, the ALJ relied on the findings of a state agency psychologist's medical source statement, along with Dr. Smith's report, to support his conclusion that Plaintiff was able to perform simple and unskilled work at the medium exertional level.[12]

---

[11] The Global Assessment of Functioning ("GAF") scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF rating between 61 and 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." See the on-line version of THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited January 20, 2009.

[12] Social Security Regulations define medium work as work involving lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, and the ability to stand and/or walk six hours in an eight-hour workday. 20 C.F.R. § 404.1567(b). We note that the only evidence to support the conclusion Plaintiff could perform at this level is the statement of the non-examining state agency physician. Plaintiff's treating physician, Dr. Coffey, opined on March 16, 2005, that Mr. Velardo was completely disabled due to back pain, COPD, asthma, arthritis and sleep apnea (Tr. 257); Dr. Summers, a one-time consulting physician, concluded he could perform work only at the light level and noted a number of postural limitations as well (Tr. 184.) The opinions of both treating and consulting physicians are entitled to greater weight than that of a non-examining physician. See 20 C.F.R. § 404.1502. However, Plaintiff does not raise any objections to this portion of the ALJ's decision in his brief in support of the motion for summary

14

(Tr. 20, *citing* Tr. 191-207.)

Judge Evans noted testimony from Plaintiff and his mother regarding his mental limitations. Plaintiff stated he had attended school through the eighth grade in special education classes composed of five students and three teachers. He attempted to obtain his GED, but was unsuccessful. (Tr. 20.) Ms. Wilson testified that her son had been diagnosed as mentally retarded at age two and was not able to speak even when he was three years old. He was placed in special education classes when he was approximately two and a half years old; he should have repeated ninth grade, but was "unable to do so because he was living with his father in Michigan." (Tr. 21.) The ALJ made no explicit finding with regard to the credibility of the testimony by Plaintiff or his mother as it pertained to his mental impairments.

We conclude the ALJ erred by misapplying, or by failing to apply, the relevant regulations regarding disability due to mental retardation. In arriving at this conclusion, we have given serious consideration to the arguments raised in Defendant's brief in support of his motion for summary judgment (Doc. No. 13, "Def.'s Brief"), but find none of them persuasive.

---

judgment and therefore we consider this argument waived. *See* Santiago-Rivera v. Barnhart, CA No. 05-5698, 2006 U.S. Dist. LEXIS 69559 at *4, n.5 (E.D. Pa. Sept. 26, 2006), *citing* Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) (an issue is waived if it is not raised in the party's initial brief.)

15

3. *Application of the law to the ALJ's analysis:*
Because we can dispense quickly with the ALJ's analysis of the
second and third prongs of Listing 12.05C, we begin with those.[13]

The second prong of Listing 12.05C requires evidence of
impairment(s) which impose "additional and significant work-related
limitations of function." This prong is satisfied if the ALJ
identifies one or more severe impairments in addition to the
claimant's mental impairment at step two of his analysis. In
August 2000, the SSA clarified that it always had intended the
phrase "to mean that the other impairment is a 'severe' impairment
as defined in §§ 404.1520(c) and 416.920(c)." *See* Markle, 324 F.3d
at 188, *quoting* "Revised Medical Criteria for Evaluating Mental
Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50746, 50772
(Aug. 21, 2000).

Here, at step two, the ALJ identified Plaintiff's "back,
bilateral hands, respiratory, left leg numbness, and depression,"
as severe impairments, yet at step three, he inconsistently
concluded that the second prong was "*definitely not met*" inasmuch
as Plaintiff's GAF score was 65[14] and the medical evidence did not

---

[13]  Neither the second nor third prong is addressed by Defendant
in his brief in support of the motion for summary judgment.

[14]  We note for the record that while this statement is true,
other medical evidence shows that Plaintiff's GAF on May 14, 2005, was
50 (Tr. 364) and on May 10, 2006, it was 54 (Tr. 348.) Neither
Social Security regulations nor case law requires an ALJ to determine
a claimant's disability based solely on his GAF score. *See* Ramos v.
Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D.
Pa. Mar. 30, 2007), and cases cited therein.

reflect that any of his impairments were so severe that he could not perform substantial gainful activity on a sustained basis. (Tr. 18-19, emphasis added.)

According to Social Security regulations, an impairment is severe if it "significantly limits" the claimant's "physical or mental ability to do basic work activities."[15] In contrast, an impairment is considered no more than "a slight abnormality" if it has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c). The ALJ correctly cited these regulations as the basis for determining if an impairment is severe, but defined "severe" impairments more generally those which "place restrictions on the claimant's ability to engage in work activity." (Tr. 17.) But by requiring at step three that Plaintiff show that his other physical or mental conditions were so severe as to preclude the performance of "substantial gainful activity on a sustained basis," rather than impairments which "significantly" limited his ability to do basic work activities, the ALJ imposed a level of severity not required by the regulations. Based on the standard set by the SSA itself in 2000, we conclude the ALJ erred as a matter of law at step three by rejecting as impairments which impose "additional and

---

[15] Basic work activities are the "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b).

17

significant work-related limitations of function" the same impairments he had found to be severe at step two.

The third prong of Listing 12.05C is satisfied when medical and other records dating from before the claimant was age 22 show evidence of mental retardation. This documentation can include school records reflecting IQ test scores or a history of special education classes. *See*, e.g., Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007) (claimant who dropped out of school at a low grade level despite participation in special education classes "likely" met the burden of establishing onset before age 22); Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006) (struggling in special education classes, having trouble with reading, writing and math, and dropping out of school in the ninth grade constituted evidence of mental retardation prior to age 22); and Blackwell v. Comm'r of Soc. Sec., CA No. 08-374, 2008 U.S. Dist. LEXIS 90303 (W.D. Pa. Nov. 6, 2008) (claimant dropped out at the middle school level, required "6 or 7 years" and the assistance of a tutor to complete a GED, and presented evidence of an IQ score of 70 when he was 11 years old.) Other evidence showing the onset of mental retardation prior to age 22 includes qualification for SSI benefits as a child based on that impairment. *See* Elder v. Comm'r of Soc. Sec., CA No. 07-59, 2008 U.S. Dist. LEXIS 60929, *25-*26 (W.D. Pa. July 31, 2008).

The ALJ completely omitted, without explanation, any reference to the third prong of Listing 12.05C. However, he did refer to Mr.

18

Velardo's IQ score of 69 when he was tested by school psychologists in 1990 at age 14 and to the fact that his fifth grade teacher reported that he was performing two or three grade levels below his chronological age. (Tr. 18-19.) He also acknowledged Ms. Wilson's testimony that Plaintiff was diagnosed as mentally retarded at age two, had developmental problems, and was placed in special education classes at the pre-school level. (Tr. 19.) He did not address other evidence in the record indicating that Plaintiff continued in special education classes at the "educable mentally impaired" level through ninth grade when he quit school. Thus, based on the similarity between the facts of this case and the evidence found persuasive in Maresh, 438 F.3d at 900, we conclude that had the ALJ formally considered this prong, he would have been compelled to find that Plaintiff's mental impairment had begun before age 22.

The ALJ's analysis of the first prong is only marginally more complete and equally troubling. While noting the scores on IQ tests performed in 1990, he found it was "inconclusive" whether Mr. Velardo met the first prong, despite his full scale IQ score of 69 (and presumably, his verbal IQ score of 70, which also falls within the criteria of 12.05C.) The only evidence he cites as the basis of this conclusion is the fact that Dr. Smith's 2004 IQ test had shown borderline intellectual functioning, rather than mild mental retardation, despite acknowledging that she had also opined that there was a 95% probability that his true full scale IQ score fell

19

between 68 and 77. (Tr. 18.)

The regulations and case law are clear that an ALJ may reject the results of an IQ test which are shown to be "invalid." In arriving at his determination of whether an IQ score is valid, i.e., the score is "an accurate reflection of [a claimant's] intellectual capabilities," the ALJ is to consider the entire record before him. Lax v. Astrue, 489 F.3d 1080, 1087 (10ᵗʰ Cir. 2007); Markle, 324 F.3d at 186. Test results may be considered invalid where there is evidence that the claimant was malingering or deliberately attempting to distort the results during the test administration[16] or when the conditions under which the test was given could have negatively affected the scores. See, e.g., Clay v. Barnhart, 417 F.3d 922, 930 (8ᵗʰ Cir. 2005) (psychologist rejected the results of the IQ test he had administered due to his conviction that the claimant was malingering); Maggard v. Apfel, 167 F.3d 376, 380 (7ᵗʰ Cir. 1989) (failure to eat for two days and drinking extensively before the IQ test may have contributed to low scores inconsistent with claimant's ability to perform his work assignments, understand and follow directions, relate to coworkers, and withstand the stress of daily work); and Lax, 489 F.3d at 1087

---

[16] Dr. Smith's report, on which the ALJ relied for his finding that Plaintiff's IQ score was high enough to preclude him from consideration under Listing 12.05C, makes no statements about Mr. Velardo's effort on the exam nor did she administer a test such as the Minnesota Multiphasic Personality Inventory ("MMPI") which measures personality traits, including malingering. See Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11ᵗʰ Cir. 1986), noting that an MMPI which reflected malingering, together with other substantial evidence, can discredit an otherwise qualifying IQ score.

20

(claimant's "inadequate" effort and inconsistent performance on IQ test resulted in scores which appeared to be an "under estimation of his cognitive abilities.") Similarly, test results may be deemed invalid where the IQ scores are inconsistent with the claimant's prior educational or work history, daily activities, behavior, or other aspects of his life. *See*, e.g., Brooks v. Barnhart, No. 04-15716, 2006 U.S. App. LEXIS 3924, *4-*5 (9th Cir. Feb. 16, 2006) (claimant who graduated from technical school with a B average, worked for 17 years as a psychiatric technician, and was attending medical technician's school with an A average at the time of her IQ test functioned at educational and occupational levels inconsistent with her verbal IQ of 59 and full-scale IQ of 65); Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998) (ALJ did not err by rejecting IQ scores of claimant who was literate, had completed ninth grade without special education classes, worked in the private sector, had a driver's license, and was the primary caretaker of her child); and Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986) (ALJ could reject otherwise qualifying IQ scores based on evidence showing claimant had an associate's degree, was currently enrolled in college, and had worked at several skilled jobs, e.g., teaching algebra at a private school).

When the ALJ makes no express finding that an IQ score is invalid and/or fails to explain his reasons for questioning the validity of the test results, some reviewing courts have concluded they must accept the score as valid and find that the claimant did

in fact meet the first prong of the capsule definition where a score is in the appropriate range. *See* Thresher v. Astrue, No. 07-35157, 2008 U.S. App. LEXIS 13189 (9ᵗʰ Cir. June 19, 2008), and Lewis v. Astrue, CA No. 06-6608, 2008 U.S. Dist. LEXIS 6108, *12-*13 (N.D. Cal. Jan. 22, 2008) (finding that the claimant satisfied the first requirement of Listing 12.05C because "the ALJ did not explicitly reject the validity of claimant's new IQ score [of 68], so the Court must accept the score as valid.")

Our analysis of the first prong is made more difficult by the ALJ's failure to make an explicit finding as to the validity of the IQ test scores received in 1990. As Plaintiff argues, he "side-stepped" his responsibility to do so and simply stated that he found those scores "inconclusive" when compared to the scores received on the tests administered by Dr. Smith in November 2004 which placed Mr. Velardo in the range of 72 to 76. (Tr. 18.) The Court's independent research has found no SSA regulation or ruling, nor case law from any circuit, which assumes that describing an IQ test score as "inconclusive" is the same as finding such a score "invalid." Applying the common dictionary definitions of those two words, it is clear they are not synonymous. "Inconclusive" is defined as "leading to no conclusion or definite result," while "invalid" means "being without foundation or force in fact, truth, law." (*See* www.merriam-webster.com/dictionary, last visited January 21, 2009.)

In her report, Dr. Smith concluded that the IQ scores on the

22

test she administered "seem valid and . . . consistent with other information in his background." (Tr. 180.) She did not, however, attempt to explain the differences between the 1990 scores and the 2004 scores, presumably because she did not have the earlier results to consider. (*See* Tr. 175, stating that the Tennessee Disability Determination Services office "did not supply me with any records to review.") Therefore, there is no evidence in the record that another professional specialist opined that the prior scores were invalid. In fact, in the file review performed by a state agency examiner on December 30, 2004, the examiner explicitly noted that "No IQ available prior to age 22" (Tr. 198), a statement which is in direct conflict with the administrative record.

At no point in his analysis does the ALJ address the validity of the earlier scores, nor does he discuss the evidence in a context which could shed light on his thinking on this question. For instance, although he noted that Mr. Velardo testified he attended special education classes through the eighth grade, was not held back at any grade level, and attempted unsuccessfully to obtain a GED,[17] as well as Ms. Wilson's testimony about the early diagnosis of mental retardation (Tr. 20-21), he did not identify other aspects of Plaintiff's educational history which would support a conclusion that the 1990 test scores were invalid. The ALJ discussed the facts that Plaintiff was married, had two

---

[17] Mr. Velardo testified (Tr. 373) that he had attempted unsuccessfully to obtain his GED on two separate occasions.

children, and that his wife had previously worked but stopped doing so in order to take care of him during the three years prior to the hearing; he also noted that after Plaintiff's wife went to Pennsylvania to take care of her grandmother, Plaintiff had moved in with his mother and grandmother and that his mother took him to visit his family in Pennsylvania on two separate occasions. (Tr. 20.) He further commented on Plaintiff's abilities to take care of his personal needs, drive with a companion, watch television, and perform normal household chores. (Tr. 22.) However, these daily activities and living arrangements were discussed only in the context of a summary of Plaintiff's testimony in general and his subjective complaints of pain and depression. That is, the ALJ did not rely on these facts to show that the 1990 IQ scores were inconsistent with Plaintiff's day-to-day activities and therefore could be considered invalid. Finally, Judge Evans noted Plaintiff's testimony that his longest job was three months as a roofer. The ALJ found it "incredulous" that during the period from 1992 to 2003, Mr. Velardo had not worked at any job more than three months, yet was able to earn more than $13,000 in one year.[18] Again, this work history is not related to the ALJ's decision to accept the 2004 test results rather than the earlier ones. In

---

[18] The ALJ did concede, however, that giving Plaintiff the benefit of the doubt, he could have earned $13,000 by working several jobs during the course of the year. (Tr. 22.) A review of the earning report shows that Plaintiff earned $13,060.93 in 2001 when he had at least four different jobs, all at the unskilled level. (Tr. 65, 68.)

24

short, the ALJ did not dismiss Plaintiff's 1990 IQ scores as invalid on the basis of other vocational, educational or behavioral information in the record which was inconsistent with scores reflecting his mild mental retardation.

Our analysis is somewhat hampered by the fact that the Third Circuit Court of Appeals has not addressed the issue of how to weigh multiple *sets* of IQ tests, one of which yields a score which would qualify the claimant for benefits, while the other does not. In an out-of-circuit case which we find closely parallels the facts herein, the claimant underwent two sets of IQ evaluations, each conducted by a psychologist; there was no evidence indicating that either psychologist had doubts about the validity of the test he administered. The first test indicated a full scale IQ of 74, a verbal score of 72, and a performance score of 79. The second, administered two years later, found an IQ of 67.[19] Ray v. Chater, 934 F.Supp. 347, 348 (N.D. Cal. 1996). The ALJ relied solely on the first test in determining that Ray did not meet the first prong of Listing 12.05D, which, like Listing 12.05C, requires a valid IQ score between 60 and 70. The district court concluded the ALJ had erred in doing so, noting that

[w]hen there are differing scores from two different I.Q. tests, the regulations do not specify which score should be relied upon. However, the regulations do state "where more than one I.Q. is customarily derived from the test

---

[19] Both tests were administered when the plaintiff was more than 30 years old; there was apparently no evidence of IQ tests administered when the plaintiff was in school.

25

administered, i.e., where verbal, performance, and full-scale I.Q. are provided. . . the lowest of these is used in conjunction with listing 12.05." Thus, it can be inferred that when multiple I.Q. scores are available the Regulations prefer the lowest score.

Id. at 350, citing Fanning v. Bowen, 827 F.2d 631 (9th Cir. 1987), where the ALJ had relied upon a test reflecting a full scale IQ score of 69, despite the fact that in a test administered a year later, the claimant's lowest score was 72.

Similarly, in Muncy v. Apfel, 247 F.3d 728 (8th Cir. 2001), the claimant was initially granted benefits after testing which revealed a full scale IQ of 59, verbal IQ of 57, and performance IQ was 64, thus qualifying for benefits under Listing 12.05B. During a continuing disability review six years later, another psychologist determined that Muncy's full scale IQ was 84, his verbal IQ was 84, and performance IQ was 84, placing him in the borderline intellectual functioning category. Id. at 731.[20] Thus, despite evidence of other severe impairments, the ALJ found that the claimant had shown "medical improvement" in his IQ which precluded him from receiving benefits on the basis of meeting a mental impairment listing. Id. at 732-733. The Court of Appeals for the Eighth Circuit concluded that the ALJ's failure to discuss

[20] Defendant describes Plaintiff's reliance on Muncy as misplaced, arguing that the case focused on SSA policy regarding multiple scores (i.e., verbal, performance, and full-scale) provided from the same test. (Def.'s Brief at 12-13 and n.3.) This argument appears to be based on a mis-reading of the case which clearly refers to two sets of IQ tests administered in 1988 and 1994.

26

inconsistencies between the two sets of IQ scores or the factors which called into question the first score's validity required remand in order for the Commissioner "to enter specific findings" to explain why Muncy's first IQ score should not be adopted as "controlling." Id. at 735. In arriving at this decision, the Court noted that

[m]ental retardation is not normally a condition that improves as an affected person ages. It is highly unlikely that an adult could gain twenty-five IQ points - a 42% increase - in six years. Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning. . . . The ALJ here cited no evidence demonstrating a dramatic upswing in Muncy's intellectual or adaptive functioning between 1988 and 1994, other than the higher second IQ score. Nor did the ALJ challenge the validity of the first IQ score as inconsistent with other evidence in the record.

Muncy, 247 F.3d at 734 (internal citations omitted.)

Similarly, in a more recent case from the Northern District of California, the claimant underwent three sets of IQ tests, two of which resulted in scores of 70 or below. Lewis v. Astrue, *supra*, 2008 U.S. Dist. LEXIS 6108, at \*4-\*5. The psychologist who administered one of the tests which resulted in qualifying scores opined that the results had been "compromised" and therefore it was apparently not relied upon by the ALJ. In rejecting the second score which satisfied Listing 12.05C in favor of the non-qualifying score, the ALJ stated that despite the validity of the second score, it was not "sufficient to establish intellectual functioning below the range of borderline intellectual functioning." Id. at

27

\*12. The district court found that the ALJ had "no legal basis" for this conclusion in light of conflicting evidence which, had it been accepted, would have presumptively satisfied the Listing. Id. at \*13. The court found that "the fact that claimant has received other IQ scores that are above 70 is irrelevant for purposes of Listing 12.05." Because the regulations required only one score within the prescribed range, the ALJ had erred by adopting the earlier score without explaining why the later score was invalid. "Certainly if subsequent higher scores do not render an earlier low score invalid for 12.05(C) purposes, there is no reason why claimant's earlier scores above 70 should have any impact on claimant's ability to meet the first prong of 12.05(C) using her 2004 score of 68." Id. at \*17-\*18.

4. *Defendant's arguments:* In the absence of any ruling, regulation or other explicit guidance from the Social Security Administration on how the results of multiple IQ tests given at different times (as opposed to the three scores derived in a single battery of tests) are to weighed, we are inclined to adopt the reasoning of the three cases noted immediately above, particularly in light of the Third Circuit's general admonition in Burns that a claimant who is alleging disability because of mental impairments should be given the benefit of the doubt. Before doing so, however, we will consider Defendant's arguments in support of his position that the ALJ correctly concluded that Plaintiff did not satisfy the first prong of Listing 12.05C.

As a threshold matter, we note that none of the arguments proffered in Defendant's brief are relied upon by the ALJ in his analysis. Thus, Defendant's arguments are in direct contradiction to the teaching of SEC v. Chenery Corp., 318 U.S. 80, 87 (1943), which requires a reviewing court to limit its consideration to what is plain on the face of the administrative agency's decision, i.e., the court may not "read into" the decision reasoning or conclusions which are not clearly stated. *See also* numerous Social Security cases citing Chenery, e.g., Fargnoli v. Halter, 247 F.3d 34, 43-44 and n.7 (3d Cir. 2001), concluding that the district court had erred when it recognized the ALJ's failure to consider all relevant and probative evidence, but attempted to rectify this error through its own analysis, thereby violating the Chenery requirement that "the grounds upon which an administrative order must be judged are those upon which the record disclosed that its action was based;" Phim Khon v. Barnhart, CA No. 03-5122, 2004 U.S. Dist. LEXIS 17781, *14 (E.D. Pa. Sept. 3, 2004) ("[t]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained," *quoting* Chenery, id. at 94); and Cefalu v. Barnhart, 387 F. Supp.2d 486, 491 (W.D. Pa. 2005) (Hardiman, J.) ("the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not

mentioned or discussed by the ALJ").

Defendant's first argument is that although the ALJ recognized Plaintiff's qualifying score at age 14, the scores of 69 and 70 "did not necessarily document that he had a lifelong significantly subaverage general intellectual functioning" as required by the Listing. (Def.'s Brief at 12.) Relying on a regulation which pertains to disability due to mental retardation in children, Listing 112.5D, Defendant argues that the medical community recognizes that test results obtained at a young age are less reliable and valid than test results obtained at an older age. Therefore, the SSA has taken the position that

> IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the IQ is less than 40, and for 2 years when the IQ is 40 above.

(Def.'s Brief, id., quoting Listing 112.00D10.)

Therefore, Defendant argues, the test scores from 1990 were considered only valid for 2 years and did not support the conclusion that Plaintiff experienced lifelong significantly subaverage general intellectual functioning. Consequently, the ALJ did not err in determining "that Plaintiff's [1990] scores were 'inconclusive' given that his IQ test results may not have been stable at that time because he was only 14 years old." (Def.'s Brief at 12-13.)

As noted above, nothing in the ALJ's decision indicates he

30

rejected the 1990 scores because of Plaintiff's age at the time;
therefore, this argument flies directly in the face of <u>Chenery</u>
principles. Second, without any citation to Social Security
regulations or relevant case law,[21] Defendant takes a criterion for
evaluating IQ tests in childhood disability cases and applies it to
adult cases. If one were to adopt Defendant's reasoning, a
claimant who was diagnosed as mentally retarded as a child under 16
but who did not have an IQ test as an adult could not continue to
collect benefits. Conversely, if the SSA required an adult to
undergo a contemporary IQ test in order to satisfy one of the four
categories in Listing 12.05, we could safely presume it would state
that requirement or, at a minimum, state that an IQ test performed
at age 16 or before is presumptively invalid. Defendant cites no
case law to support this argument and the Court has been unable to

---

[21] Defendant cites to <u>Barnhart v. Walton</u>, 535 U.S. 212, 217
(2002) for the unremarkable principle that courts should grant
considerable leeway to the Administration's interpretation of its own
regulations. Had the SSA, through the ALJ, clearly interpreted
Listing 12.05C or Listing 112.05D, we would, of course, be compelled
to accept any interpretation which was "based on a permissible
construction" thereof. <u>Id.</u> at 218. However, <u>Barnhart v. Walton</u> did
not address Listing 12.05, 112.05 or IQ tests in general and, as noted
in the text above, the SSA has apparently not offered any
interpretation of how multiple IQ tests given on two or more separate
occasions are to be weighed. The other cases relied upon by Defendant
in this portion of his brief, <u>Elam v. Comm'r of Social Sec.</u>, 348 F.3d
124 (6th Cir. 2003), and <u>Conway v. Astrue</u>, 554 F. Supp.2d 26 (D. D.C.
2008), are not on point. Both concerned child applicants who were
initially tested at an early age and found to meet the criteria of one
of the categories in Listing 112.05, but whose later tests – while
still considered under the criteria for determining disability for a
child, not an adult – showed sufficient improvement to disqualify them
from receiving benefits. Listing 12.05 did not come into play nor was
there any question that under Listing 112.05D, the first set of test
scores had, in so many words, "expired." <u>See</u> <u>Elam</u>, 348 F.3d at 125-
126, and <u>Conway</u>, 554 F. Supp.2d at 35-36.

31

identify any cases which would do so. Moreover, as noted above, it is generally accepted that "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." Muncy, 247 F.3d at 734-735.

Next, Defendant dismisses Dr. Smith's finding that there was a 95% probability that Plaintiff's true full scale IQ score fell between 68 and 77 as "at best, equivocal support" for Plaintiff's argument that the ALJ erred. Defendant contends that because Dr. Smith ultimately diagnosed Mr. Velardo with borderline intellectual functioning, a level associated with an IQ in the range of 71 to 84, this finding suggests Dr. Smith believed that "the 95% was more in the 71 to 77 range than in the 68 to 70 range." (Def.'s Brief at 13.) Without objective evidence, what Dr. Smith "believed" regarding the 95% probability factor is beyond the scope of this Court's powers to discern, particularly when, despite significant research efforts, we have found no reported Social Security benefits case which relied on such tenuous reasoning.

Defendant also argues that Plaintiff never introduced any medical evidence confirming that he was mentally retarded and, in fact, the evidence showed he was more likely at the level of borderline functioning and may, in fact, have been in the average or "fair intellectual ability" range. According to Defendant, Plaintiff received special education services because of a learning disability, not because he was mentally retarded, and none of the treatment records from a psychiatric hospital where he was treated

32

for depression or from his family physician indicated that he was mentally retarded. (Def.'s Brief at 13-14, *citing* numerous points in the transcript.)

Again, this argument is never mentioned by the ALJ as the basis for his conclusions. Moreover, Defendant seems to be arguing that a formal diagnosis of mental retardation is necessary to qualify for benefits under Listing 12.05C, a position which is directly rejected by case law. As pointed out in another case where the Commissioner argued that without a finding that the claimant was mentally retarded, she could not satisfy Listing 12.05C, "[a]lthough the requirements of Listing 12.05's introductory paragraph are mandatory, it does not require a formal diagnosis of mental retardation." Blackstock v. Astrue, 527 F. Supp.2d 604, 619 (S.D. Tex. 2007), *citing, inter alia*, Maresh, 438 F.3d at 899, and Markle, 324 F.3d at 187. Instead, as noted in Blackstock and discussed above, the claimant must simply satisfy the three prong "diagnostic description" of mental retardation in the introductory paragraph of Listing 12.05. Thus, the lack of any formal diagnosis of mental retardation is irrelevant to the analysis. And, Dr. Smith's diagnosis of borderline intellectual functioning is equally irrelevant unless the qualifying IQ score of 69 is deemed invalid.

Defendant's last argument is that Plaintiff has not demonstrated the "significantly subaverage general intellectual functioning with deficits in adaptive functioning" necessary to

33

meet Listing 12.05. Relying on the DSM-IV, Defendant argues "adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." (Def.'s Brief at 16.) The Commissioner argues that the record shows Plaintiff did not demonstrate such deficiencies, but in fact had a good marriage, was never fired from a job, performed routine household chores, watched TV and played video games, could manage his own money, and had intact insight, judgment, and ability to relate to others. (Id. at 14-16, citing numerous points in the administrative record.)

A recent decision by another member of this Court has addressed the precise issue on which Defendant's final argument is focused. See Logan v. Astrue, CA No. 07-1472, 2008 U.S. Dist. LEXIS 71880 (W.D. Pa. Sept. 16, 2008). Judge Nora Barry Fischer pointed out therein that although the SSA revised Listing 12.00 in 2000, it did not provide a definition of "deficits in adaptive functioning," nor establish standards or guidelines by which to assess and measure the existence or severity of such alleged deficits. Similarly, there is no Third Circuit case addressing this precise issue. Id. at *25-*26.

Judge Barry Fischer also pointed out that in a subsequent regulation, "Technical Revisions to Medical Criteria for Determinations of Disability," 67 Fed. Reg. 20018 (April 24, 2002),

34

the SSA commented that it had specifically chosen not to adopt the definitions of "mental retardation" and "deficits in adaptive functioning" found in the DSM-IV. Instead, it considered the definitions proffered by the four major professional organizations in the United States which work with mentally retarded individuals, including the American Psychiatric Association ("APA"), the American Association on Intellectual and Developmental Disabilities (formerly the American Association of Mental Retardation ("AAMR")), and others. The SSA clarified that "it does not seek to endorse the methodology of one professional organization over another" and would therefore allow use of the measurement methods recognized and endorsed by any one of the four recognized professional organizations. <u>Logan</u>, 2008 U.S. Dist. LEXIS 71880 at *27. According to the SSA, in order to properly assess a claimant's alleged mental retardation to determine if deficits in adaptive functioning exist, the ALJ should therefore consult the DSM-IV, the standard established by the AAMR, or the criteria of the other major mental health organizations.[22] <u>Id.</u> at *27-*28.

---

[22] "The DSM-IV. . .provides the following standard for measuring deficits in adaptive functioning: 'significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" <u>Logan</u>, 2008 U.S. LEXIS 71880 at *26, n. 3, citing the DSM-IV at 39. "The AAMR. . .provides the following standard: 'significant limitations in intellectual functioning and in adaptive behavior as expressed in conceptual (i.e., receptive and expressive language, reading and writing, money concepts, and self-direction); social (i.e., interpersonal, responsibility, self-esteem, gullibility, naivete, follows rules, obeys laws, and avoids victimization); and practical adaptive skills (i.e., personal activities of daily living

In the absence of binding precedent from the Third Circuit, the court in <u>Logan</u> considered how this regulation has been applied in other courts. In <u>Barnes v. Barnhart</u>, No. 02-5153, 2004 U.S. App. LEXIS 24576, *13-*14 (10th Cir. Nov. 26, 2004), the court remanded the case for further consideration because, although the ALJ had considered the claimant's daily activities, social skills, and educational history, he had not identified or applied any one of the four professional measurements but instead applied his own "improvised functional approach." In <u>Witt v. Barnhart</u>, 446 F. Supp.2d 886, 895-897 (N.D. Ill. 2006) (remanded on other grounds), the court affirmed the ALJ's decision that the plaintiff did not satisfy the capsule definition of Listing 12.05, in part because the ALJ had used the criteria set forth in the DSM-IV and identified the substantial evidence which supported his conclusion that the plaintiff failed to exhibit the necessary deficits in adaptive functioning. Although in <u>Bouton v. Astrue</u>, CA No. 07-4039, 2008 U.S. Dist. LEXIS 40650, *25 (D. Kans. Feb. 12, 2008), the ALJ had not explicitly indicated which of the measurement methods he used in determining the claimant's level of adaptive functioning, the district court found the assessment

such as eating, dressing, mobility and toileting; instrumental activities of daily living such as preparing meals, taking medication, using the telephone, managing money, using transportation, and doing housekeeping activities; maintaining a safe environment, and occupational skills).'" <u>Logan</u>, <u>id.</u> at *27, n. 4, citing the AAMR Manual of Diagnosis and Professional Practice in Mental Retardation, 1993.

proper because he considered evidence that assessed the specific skill areas identified in the DSM-IV. Finally, in <u>Rodriquez v. Astrue</u>, CA No. 07-906, 2008 U.S. Dist. LEXIS 90634, *12-*13 (D. Colo. May 2, 2008), the court found that because the ALJ had considered the claimant's "strong work history," but had neither adequately assessed her other limitations nor indicated the definition or standard he had used to assess defects in adaptive functioning, the case must be remanded for further consideration of other skill areas or behaviors identified by one of the recognized professional organizations.

Here, of course, the ALJ never considered *any* criteria for determining deficits in adaptive functioning, in fact, the phrase "adaptive functioning" never appears in his decision. Defendant would have us "transfer" the evidence which the ALJ did discuss in his analysis of Mr. Velardo's depression and physical impairments and "assume" the result would be that he would have found Plaintiff had no such deficits. In <u>Cortes v. Comm'r of Soc. Sec.</u>, No. 06-3562, 2007 U.S. App. LEXIS 27554 (3d Cir. Nov. 28, 2007), as in this case, the ALJ never ruled on the "adaptive functioning" issue. Citing <u>Chenery</u>, *supra*, the Court of Appeals rejected the Commissioner's argument that the ALJ's decision was based on the plaintiff's level of adaptive functioning which was inconsistent with a finding of mental retardation, and declined to consider what significance, if any, the adaptive functioning determination might have had on the case. We will follow the reasoning of <u>Cortes</u> and

37

similarly decline to perform our own analysis of the adaptive functioning question.

## V. **FURTHER PROCEEDINGS**

"A district court, after reviewing the decision of the Commissioner, may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 549 (3d Cir. 2003). However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

The ALJ's analysis in this matter is deficient on many levels – the failure to explicitly determine the validity of Plaintiff's first set of IQ scores, the omission of any consideration of the third prong of Listing 12.05C, the internally inconsistent conclusions regarding the severity of Plaintiff's other physical and mental impairments, and the omission of any analysis regarding adaptive functioning. We conclude, however, that this case is not so clear that we can justifiably award benefits. We therefore deny Defendant's motion for summary judgment; deny Plaintiff's motion for summary judgment insofar as he seeks an award of benefits and grant it insofar as he seeks remand; and remand so the ALJ can

38

clarify in particular his reasoning on the validity of Plaintiff's 2004 IQ scores and his analysis of the adaptive functioning question. An appropriate order follows.

January ___39___, 2009

William L. Standish
United States District Judge